Filed 3/11/21  P. v. Sanders CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>TROY DOUGLAS SANDERS,<br><br>Defendant and Appellant. | F077964<br><br>(Super. Ct. No. BF169218A)<br><br>**OPINION** |

-ooOoo-

### INTRODUCTION

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill, Louis M. Vasquez and Jennifer Oleksa, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### INTRODUCTION

In the early morning hours of July 4, 2017, a shooting occurred in Bakersfield that left Michael Dorrough dead and his girlfriend severely injured.  It was the prosecution's

theory that appellant Troy Douglas Sanders committed this shooting. According to the prosecutor, Sanders was the direct perpetrator and Rudolph Romels Gibson drove the getaway vehicle.[1] A jury convicted Sanders of first degree murder, attempted murder, assault with a semiautomatic firearm, possession of a firearm by a felon, and active participation in a criminal street gang. The jury found true numerous sentencing enhancements. Sanders was sentenced to prison for life without the possibility of parole (LWOP), plus 25 years to life, plus life with a minimum parole eligibility of 30 years, plus 25 years to life, plus 33 years.

Sanders contends the evidence is insufficient as a matter of law to support his convictions. We agree. While a surveillance camera recorded a significant portion of this shooting, the recording raises clear reasonable doubt that Sanders was the direct perpetrator of these crimes, and the remaining circumstantial evidence does not reasonably establish that he was the gunman. A reasonable jury could not have convicted Sanders beyond a reasonable doubt based on the trial evidence. Consequently, we must reverse his convictions. Based on principles of double jeopardy, retrial is barred. (See *Lockhart v. Nelson* (1988) 488 U.S. 33, 39-40; *People v. Pierce* (1979) 24 Cal.3d 199, 209-210.)

## BACKGROUND

We summarize the material trial evidence, along with Sanders's convictions and the sentence imposed against him.

---

[1] Sanders was tried alone. Gibson is not a party to this appeal.

## I.    The Events At The Restaurant Prior To The Fatal Shooting.

Early the morning of July 4, 2017,[2] around 1:00 a.m., Michael Dorrough and his girlfriend, Alize W.,[3] visited a restaurant in Bakersfield.  Alize's sister was working at that establishment that night.  Dorrough and Alize remained inside the restaurant for about one hour.  During that time, they did not have a dispute with anyone.[4]

At around 2:00 a.m., Dorrough and Alize left the restaurant, which was closing.  They walked to Alize's vehicle parked outside.  Alize stood on the passenger side of her vehicle while she spoke with her sister; Dorrough sat in the driver's seat.  While Alize and her sister spoke, Sanders approached them.[5]  According to Alize, Sanders asked her if she had a boyfriend.  In response, she pointed to Dorrough.  The passenger door was open.  According to Alize, Dorrough told Sanders, "She's good."  Sanders put up his hands and he walked away.

About 18 seconds later, Sanders returned and stood next to Alize's vehicle on the passenger side.  He leaned over the open door and looked inside the vehicle.  According to Alize, Sanders told Dorrough, "Fuck Mike-Mike."  Dorrough did not respond.  Sanders walked away.  About two seconds later, an unidentified male approached the

---

[2] References to dates are to dates in 2017 unless otherwise stated.

[3] To protect her privacy, we will refer to Dorrough's girlfriend only by her first name and last initial.  (Cal. Rules of Court, rule 8.90(b)(4).)

[4] Sanders had been inside the restaurant while Dorrough and Alize were there.  Alize told the jury that Sanders had been with a group of people.  According to her, that group had looked like "bad news," and "they weren't there to have fun."

[5] Surveillance video shows that, about 30 seconds before Dorrough and Alize exited the restaurant, Sanders walked to his vehicle and sat inside it on the passenger side.  Sanders's white vehicle was parked near the victims' vehicle.  Sanders glanced in the general direction of Dorrough and/or Alize one or two times before he approached Alize and her sister.  At trial, Alize identified Sanders as the person who approached them.  Alize's sister testified at trial that the person who approached them was a "light skinned" African-American male.

victims' vehicle, squeezing past Alize.[6]  The unidentified male leaned inside the open passenger door.  According to Alize, the second male also told Dorrough, "Fuck Mike-Mike."  The second male reached inside the vehicle and shook Dorrough's hand.[7]  Dorrough told the second male, "I don't gang bang;" Alize told him the same thing.

## II.     The Shooting Outside The Marijuana Shop.

After this encounter in the parking lot of the restaurant, Dorrough and Alize drove away.  Alize told the jury that "everyone went their separate ways; so we just thought everything was fine and nothing escalated."  She denied that either she or Dorrough ever said anything negative to Sanders or to the other unidentified male.  Alize told the jury that, after driving away, she did not notice anyone following them.  Dorrough never said anything to her about a vehicle following them.

In the surveillance video showing the restaurant parking lot, Sanders is seen directing Rudolph Romels Gibson towards a white vehicle.  This occurs about six seconds after Dorrough and Alize drove away.  Gibson is wearing a dark colored T-shirt and dark jeans/pants.  He appears taller than Sanders, and a little heavier.  Sanders gets into the passenger side of the white vehicle, and Gibson gets into the driver's seat.  Their white vehicle leaves the parking lot of the restaurant about 40 seconds after Dorrough and Alize drove away.

---

[6] Other than this moment in the restaurant parking lot, no other evidence established a link between Sanders and this unidentified male.  At trial, Alize testified that both Sanders and this other male had pushed her out of the way.  She also implied that both Sanders and this other male shook Dorrough's hand.  The surveillance video, however, only shows the other male pushing past Alize and reaching inside her vehicle in an apparent attempt to shake Dorrough's hand.

[7] The prosecution established that Dorrough had been a friend of "Mike-Mike," who was Michael Whatley.  Whatley was a Westside Crips gang member who had been killed around 2015 by a member of the Eastside Crips.  Alize testified at trial that she did not know what Sanders and the other male meant by the name "Mike-Mike."  Dorrough did not go by that nickname.

It is undisputed that, after leaving the restaurant, Dorrough and Alize drove to a marijuana shop located in Bakersfield. Surveillance video outside the marijuana shop shows them driving into that parking lot. Based on the timestamp on that video, and based on trial testimony from law enforcement personnel who compared that timestamp to the correct time, Dorrough and Alize pulled into the parking lot at the marijuana shop at approximately 2:05 a.m..[8]

About 10 seconds after they pulled into this parking lot, and while Dorrough is still parking their vehicle, a light-colored vehicle is seen driving past the entrance to that same lot. The light-colored vehicle parks on the street nearby and it extinguishes its headlights.

After parking, Dorrough enters the marijuana shop alone. While Dorrough is inside the shop, the surveillance video shows a male walking towards Alize's parked car. The male walks from the street and from the general direction where the light-colored vehicle had parked on the street. The male comes around the corner of a fence at the entrance/exit of the parking lot. This male briefly stands behind Alize's vehicle and peers inside it. The male walks back toward the street and disappears around the same fence.[9]

Just under one minute after that male suspect disappears around the corner of the fence, Dorrough returns to Alize's vehicle and gets behind the wheel.[10] Dorrough backs

---

[8] The surveillance video which captured a significant portion of this shooting recorded the images in black and white. The timestamp on this video shows Dorrough and Alize arriving at the marijuana shop at about 2:19 a.m.. At trial, an evidence technician and a lead investigating detective explained that this timestamp was about 14 minutes too fast.

[9] Sanders is African-American. Alize's sister informed law enforcement that, on the night of this shooting, he was wearing a gray shirt. A deputy who first viewed the shooting footage on the night of this incident wrote a report indicating that this male suspect was white or Hispanic wearing a white shirt and dark jeans.

[10] While inside the shop, Dorrough purchased $10 or $20 worth of marijuana.

their vehicle away from the shop.  He turns towards the exit and begins to drive towards the street.  While Dorrough is driving forward slowly, and while still in the parking lot, the shooter appears around the corner of the fence and rushes towards Alize's vehicle.[11]

While running at the victims, the shooter fires a handgun multiple times.  The shooter is on the passenger's side of Alize's vehicle.  Part of the shooting occurs off camera, but it appears the shooter continues firing until he is immediately adjacent to the vehicle.[12]  The shooting lasts about 10 seconds.  Based on the corrected timestamp, the shooting occurred at approximately 2:08 a.m..

When finished firing, the shooter runs towards the street and disappears around the fence.  The shooter gets into the passenger side of the same light-colored vehicle parked on the street, which speeds away.

## III.   Law Enforcement Responds To The Shooting.

Law enforcement responded to the scene shortly after this shooting.  Dorrough was found deceased in the driver's seat.  He died from multiple gunshots he received during this incident, and at least four gunshot wounds were fatal.  Alize was struck with multiple bullets, including one to her head, and she sustained major trauma.[13]  She was transported to a hospital via ambulance.

## IV.   An Occupied Parked Vehicle Was Struck With A Bullet.

One of the shooter's bullets hit an occupied vehicle parked near the marijuana shop.  One of that vehicle's occupants told law enforcement that, sometime after the

---

[11] About one minute and 18 seconds elapse between the time the suspect disappears around the fence after peering into Alize's parked vehicle and when the shooter rushes around that fence and opens fire.

[12] Some of the spent shell casings were recovered from inside Alize's vehicle.

[13] At the time of trial, Alize could not remember much about the shooting.  She told the jury that she could not recall much after leaving the restaurant.  She remembered being shot, and she testified that the shooter was a man.  She testified that it took her months to regain her memory about these events.

6.

shooting stopped, she had spotted a bald Hispanic man in his mid-30's wearing a white T-shirt and blue jeans. She saw this male when Alize's vehicle was slowly moving forward.[14] She described the man's face as "like a little sucked in." This witness informed investigators on the night of the shooting that she saw the Hispanic male walk quickly away. At trial, however, she could not remember how he had been walking. She told the jury that she did not know if that Hispanic male was involved in the shooting.[15]

At trial, this witness explained that she had used the term "sucked in" because it had looked like that Hispanic male was on drugs or had been using drugs. She testified that it was about five minutes after the shooting that she saw the Hispanic male. She told the jury that she could not remember much about this incident, but she agreed on cross-examination that Sanders did not have the same "sucked in" face as the Hispanic male that she saw. She admitted at trial that she had consumed up to five cans of beer in about two hours prior to this shooting, and she had smoked a marijuana blunt "a little bit before" the shooting occurred. She admitted that she had been "buzzing" from the marijuana "a little bit."

## V.     The Forensic Evidence.

Law enforcement recovered 30 spent shell casings at the scene of this shooting, the majority of which were found inside Alize's vehicle. All of the casings were .9-caliber, and all were from the same manufacturer. Law enforcement believed that all of these shots were fired from a single semiautomatic handgun.[16] The 30 rounds were fired

---

[14] In the surveillance video, Alize's vehicle is seen sporadically and periodically moving forward slowly after the shooter flees. A responding deputy testified that, when he checked on Dorrough and Alize, their vehicle was running and he placed it into "park" to prevent it from moving.

[15] At trial, this witness testified that she heard the shots but she did not see the shooter.

[16] In the surveillance video outside the marijuana shop, only one shooter is visible, and it appears that the shooter only fires a single handgun.

in about 10 seconds, which caused law enforcement to believe that the shooter had used an illegal oversized magazine.

Swabs from 21 shell casings were submitted to a lab for analysis. Only one sample had sufficient DNA for analysis, and only a partial profile was obtained.[17] Sanders and Dorrough were excluded as contributors to the partial DNA profile on that shell casing.[18]

On the night of the shooting, law enforcement searched Alize's vehicle for possible latent prints. Sanders's left palm print was discovered on the top of the passenger side mirror of Alize's vehicle.[19]

## VI.    The Surveillance Videos.

On the night of this shooting, law enforcement collected surveillance video from the marijuana shop. Later that morning, a lead detective in this matter, Victor Garcia, spoke to Alize's sister. Garcia learned that Dorrough and Alize had been at the restaurant about 10 minutes before this shooting took place.

The following day, law enforcement collected surveillance video from an auto glass business near the marijuana shop. On or about July 6, law enforcement collected surveillance video from the restaurant. On or about July 10, law enforcement collected

---

[17] The jury was informed that, for multiple reasons, it is difficult to obtain a DNA profile from shell casings.

[18] It was approximately September 2017 when law enforcement submitted Sanders's and Dorrough's respective DNA samples to the lab to be tested against the shell casings. At that time, Gibson was still at large and law enforcement was unable to send a sample of his DNA. Law enforcement located Gibson out of state several months later. On or about May 25, 2018, Gibson was brought back to California just before this trial started.

[19] Alize testified at trial that Sanders was a stranger to her. She testified that he had been near her vehicle only on the night of this shooting. She also testified that the second unidentified male who spoke to Dorrough was a stranger.

8.

surveillance video from a gas station along a route connecting the restaurant to the marijuana shop.

After reviewing footage of the restaurant parking lot, law enforcement determined that some suspects had initially walked to the restaurant from a nearby Fastrip convenience store. On or about July 11, law enforcement collected surveillance video from the Fastrip. Based on images taken from the surveillance video from the Fastrip, members of the gang suppression unit in the Bakersfield Police Department recognized Sanders and Gibson.

## VII. The Pretrial Identifications.

At the hospital on July 4, Garcia spoke with Alize's sister. She believed that the male (later identified as Sanders) who had approached them in the parking lot of the restaurant had been wearing a gray shirt that night.[20]

On or about July 26, Garcia met with Alize. At that time, she was receiving treatment in a rehabilitation center, and she continued to suffer from extensive injuries. Garcia showed her some photographic lineups, one of which included Sanders's picture, and asked her if she could identity anyone. She identified two photos from different lineups, but neither was of Sanders.

On or about August 1, Garcia showed photographic lineups to Alize's sister. She identified Sanders's photo as someone she generally recognized from seeing him at the restaurant. At trial, the sister testified that she was 80 to 90 percent certain that Sanders was the "fit guy" who had spoken to Alize in the parking lot outside the restaurant on the night of this shooting.[21]

---

[20] In the surveillance video from Fastrip, Sanders is seen wearing a light-colored V-necked T-shirt. His shirt appears white, but it is possibly gray. His shirt also appears white in the video outside the restaurant, but it is also possibly gray.

[21] The prosecution's gang expert told that jury that Sanders is very "lean" and a "muscular individual."

9.

**VIII.  Sanders Is Arrested.**

Sanders was arrested for this shooting on July 28.  His cellphone was seized, along with a 2005 white Toyota Solara registered to his girlfriend.

**IX.    The Cellphone Data.**

Based on data associated with Sanders's cellphone, law enforcement was able to determine the general locations where that phone had been on the night of this shooting. That information, however, could not provide a "pinpoint" location.

Cellphone data suggested that, at about 1:33 a.m., Sanders had been in the general vicinity of the restaurant.[22]  The data showed that his phone moved east sometime after 1:33 a.m.  The phone was in the general area of the shooting shortly after 2:30 a.m.[23] That general area, however, also encompassed the location of Sanders's residence.  The cellphone data showed that, between 2:25 a.m. and 2:53 a.m., Sanders's cellphone moved in a northerly direction, which was towards the area of Gibson's residence.

**X.     The Pretrial Statements And Trial Testimony Of Sanders's Girlfriend.**

At all relevant times in this matter, Sanders resided with his girlfriend, Brenda Barba Navarro.[24]  On July 28, she spoke with two detectives, Garcia and Robert Randall Meyer.  Earlier that day, Sanders had been arrested in this matter, and Navarro's white 2005 Toyota Solara had been seized.  While she spoke with the detectives, Navarro and Sanders's residence was being searched by other law enforcement personnel.[25]

---

[22] During closing argument, Sanders's trial counsel conceded that it was "pretty clear" Sanders had been at the restaurant.

[23] The jury was told that cellphone data was not captured in a consistent manner. The data could be captured minute by minute, or intervals closer to an hour.  Location data, however, was more commonly generated when the cellphone was in use.

[24] Navarro told the jury that "Navarro" was her "official name" but she used "Brenda Barba."

[25] Navarro did not know why Sanders had been arrested.  She told detectives that, as far as she knew, he did not participate in a criminal street gang.

## A. Navarro's relevant statements to the detectives.

Navarro informed the detectives that Sanders normally drove the Solara and she drove another vehicle. The detectives focused on Sanders's whereabouts on the night of the shooting. Navarro checked her old text messages from the night in question, and read some of them out loud.

At about 1:10 a.m. that night, Sanders had texted he would "be home to wake you up." She explained to the detectives that she had been mad because he was not home. Sanders had texted that she should trust him. At about 1:15 to 1:20 a.m., Sanders texted that "Mel" was going to spend the night.[26] At about 1:27 a.m., Sanders texted, "I'll see you in 15." Navarro told the detectives that she was mad at Sanders, and, at about 1:30 p.m., she texted him and told him to stop texting her. She told the detectives that they did not text after that because "he was with me on the 4th 'til July 5."

Meyer asked Navarro, "After you guys had your guys' argument over the phone did he come home with uh (Mel)?" Navarro answered, "No he didn't come home with (Mel)." Garcia asked if she knew where Sanders had been and whether he had told her where he had been. She answered, "Mm-mm no we were mad." She denied that ever brought guns into their residence, and she had never seen him with a gun.

Navarro told the detectives that she was mad because Sanders had said he was with family on the night in question, but he did not tell her where they went. She told the detectives that she did not believe Sanders had done anything to get arrested, and she could not see him committing murder.

## B. The relevant trial testimony from Navarro.

At trial, Navarro recalled telling the detectives that she had had no idea where Sanders had been in the early morning hours of July 4. She confirmed at trial that she had texted with him that night. They had argued that night because he was out so late.

---

[26] "Mel" appears to be Gibson, whose middle name was Romels.

She had been upset with him, and she suspected he was not with his family. She testified that Sanders had a "history of flirting with other females." She said that a lot of males did not like him "because he would flirt with their girlfriends."

According to Navarro, Sanders sent her a text message about 1:10 a.m., indicating that he would be home to "wake" her, which she explained meant that he "wanted to hook up." According to Navarro, at around 1:30 a.m., he texted that he would be home in 15 minutes with Mel.

At trial, Navarro denied telling the detectives that Sanders never came home that night. She told the jury he came home "a little bit after" 1:30 a.m. in the morning on July 4, and he was home before 2:00 a.m.; she denied Mel was with him when he arrived. Navarro testified she stopped texting with Sanders at 1:30 a.m. when he said he would be home in 15 minutes. She was confident that he returned home soon after because she would have otherwise continued to text him regarding his whereabouts.

### C.     The relevant trial testimony from Meyer.

Meyer told the jury that, during Navarro's interview, she had stated that Sanders never came home on the night of this shooting. Meyer explained that Navarro had not given the detectives full access to view her cellphone messages. Instead, she had read them out loud. Meyer believed Navarro made it clear from the entire conversation that Sanders had not come home that night. Meyer, however, agreed that he never asked Navarro whether Sanders came home by himself, only if he came home with Mel.

## XI.    The Trial Evidence Was In Conflict Regarding The Race Of The Suspect Seen In The Shooting Video.

On the night of this shooting, a deputy viewed surveillance video of the shooting while still at the marijuana shop. The deputy wrote a report indicating that the shooting suspect was white or Hispanic with "a stocky build" and wearing "a white shirt and dark-colored jeans." At trial, the same deputy testified that the shooting suspect had appeared muscular. The deputy, however, noted for the jury that this surveillance video was poor

in quality because it was dark and grainy. The deputy testified that his racial identification had been based on the suspect's "skin complexion in the video." On redirect examination, the deputy agreed it was possible that the male who had peered into Alize's vehicle had been wearing a shirt that was not white, but a different color. The deputy also agreed it was possible that this suspect was possibly a race other than white or Hispanic. The deputy noted that, when he initially viewed the video and wrote his report, he had believed this suspect had been holding "an object" in his right hand when he had peered into Alize's vehicle.[27] The deputy confirmed at trial that he based his racial identification on the suspect's arms because the suspect's face was not visible in the video.

At trial, Garcia said that, on the night of this shooting, he had viewed the shooting video. At that time, he had been unable to determine the ethnicity of the male who is seen peering into the back of Alize's vehicle just prior to the shooting. He told the jury it was hard at that time to reach a conclusion because the camera appeared to be "in a night vision mode, possibly assisted with an infrared lighting. Anybody that has cameras know[s] that when a camera is in a night vision mode, it could change the complexion of a person …."[28] Garcia testified he had subsequently reached a conclusion regarding that suspect's ethnicity. Based on all of the evidence in the case, he believed that person was "a light-complected African-American male." He told the jury he believed the suspect who looked into the back of Alize's vehicle was the same person who later fired the shots.

---

[27] In the surveillance video, it appears the suspect is holding an object in his right hand near his waist. It is impossible to identify that object. However, based on how the object is held, it could be a handgun. This suspect also appears to be wearing a watch, or a similarly shaped item, on his left wrist.

[28] Other than this comment from Garcia, the prosecution offered no other evidence regarding how night vision mode might have impacted this recording.

## XII. During Her Pretrial Interview With Law Enforcement, Alize Had Not Stated That Sanders Had Said "Fuck Mike-Mike."

When interviewed by law enforcement prior to trial, Alize had stated that, when she was with her sister and Dorrough in the restaurant parking lot, it was the unidentified male who told Dorrough, "Fuck Mike-Mike." At trial, however, she testified that it was *both* Sanders and the other male who separately told Dorrough, "Fuck Mike-Mike." At trial, Alize's sister testified that she never heard anyone say, "Fuck Mike-Mike."[29]

Garcia told the jury that it was on the Friday before trial started that Alize had told him for the first time that multiple people had said, "Fuck Mike-Mike."

## XIII. Garcia Informs The Jury Why He Believed Sanders Was The Shooter.

At trial, Garcia noted "similarities" he perceived between Sanders and the suspect recorded in the shooting video. Both Sanders and the suspect were big and muscular, and both wore dark colored jeans and "a tight form-fitting shirt." Garcia also noted similarities that he perceived between the seized Solara, the light-colored vehicle seen outside the restaurant, and the light-colored vehicle which drove the shooter away from the marijuana shop. Garcia explained to the jury why he believed it was the seized Solara which had been used in this shooting. He focused on the Solara's following characteristics : (1) it was compact and low to the ground; (2) it had an air intake at the very bottom of the front license; (3) it had a distinctive front grille; (4) it had distinctive "long" headlights and taillights; (5) it had a small rear spoiler over the trunk; (6) it had a sunroof; and (7) it had hood damage.[30]

---

[29] The video from the restaurant shows Sanders and the other unidentified male separately approaching Alize's vehicle.

[30] Because of the poor quality of the surveillance video, most of these characteristics are impossible to see in the footage showing the shooter's vehicle fleeing the murder scene. The Solara has the same general shape as the vehicle used to drive the shooter away. In addition, the Solara has a similar front grille, headlights, and taillights as the shooter's vehicle. However, it is impossible to see whether or not a sunroof and/or a rear spoiler are visible on the vehicle used to drive away the shooter. It is also

14.

According to Garcia, video from a gas station showed a similar light-colored vehicle following the victims' vehicle after the victims drove away from the restaurant. He acknowledged that some of the features that he considered to be distinctive—the headlights, taillights, front grille, and air intake—were standard on all Toyota Solara models made between 2004 and 2008. He also acknowledged that all Solaras with a spoiler had the same spoiler.

At trial, Garcia reviewed an image taken from the video showing the shooter's vehicle speeding away from the marijuana shop. According to Garcia, the shooter's vehicle had the same "air intake on the bottom" and a "similar hood or grille" when compared to the Solara. He admitted, however, that, other than the video from the gas station, none of the surveillance videos showed a light-colored vehicle with a sunroof.

## XIV. The Relevant Gang Evidence.

The prosecution established that the Eastside Crips are a criminal street gang, and they are rivals with the Westside Crips. The prosecution's gang expert explained where the Eastside Crips operate in and around Bakersfield. He testified that the Eastside Crips' primary criminal activities included shootings and homicides, among other crimes. The expert explained how Eastside Crip gang members gain "respect" from fellow gang members, how they put in "work" for the gang, and how they settle disputes with violence. The expert told the jury that Eastside Crip gang members commonly commit crimes together.

The jury learned about prior predicate offenses involving three Eastside Crip gang members. The jury was shown a number of pictures depicting the gang tattoos on these other gang members. The jury heard the circumstances surrounding how and why these other gang members were arrested and convicted.

---

impossible to see whether or not any damage appears to the front hood of the shooter's vehicle.

The jury learned about some of law enforcement's prior contacts with Sanders. In 2007, an officer arrested Sanders at a shopping mall.[31] He had been involved in a possible fight, and security officers were attempting to control him. After taking him into custody, the officer located a loaded .38-caliber firearm in the pocket of his pants. Sanders said he had the firearm for protection, but denied being involved in any gangs. An officer in the gang unit, however, reported that Sanders was a gang member. He was subsequently convicted for possession of a loaded firearm by a member of a criminal street gang.[32]

In 2015, Sanders was the passenger in a vehicle that was stopped by an officer. Gibson was also a passenger in that vehicle. Inside the vehicle, the officer recovered two handguns inside a purse. Both Sanders and Gibson were arrested, and both were convicted of possession of those firearms.

In 2016, officers searched Sanders's residence as part of a probation check. He was compliant during the search. No firearms were located, and nothing illegal was found.

The prosecution's gang expert opined that Sanders was an active Eastside Crips gang member when this shooting occurred.[33] The expert found it significant that Sanders previously had admitted to an officer that he was an Eastside Crip gang member, and he continued to spend time with members of that gang. The expert also focused on the fact

---

[31] Sanders was born in February 1991.

[32] A police report generated from the 2007 incident indicated that an officer from the gang unit had recognized Sanders and, and that time, the gang officer had stated that Sanders was a "known" member of the *Westside* Crips. During the trial in this matter, the prosecution's gang expert agreed that the information from the 2007 report was incorrect and that Sanders had never been a member of the Westside Crips. The prosecution's gang expert informed the jury that Sanders was a member of the Eastside Crips.

[33] Sanders has no tattoos on his body. He does not have a gang moniker. The prosecution's gang expert testified that about 60 percent of Eastside Crips have monikers.

Sanders had been armed with a firearm as a teenager while at the mall. According to the expert, that behavior suggested Sanders's gang involvement even as a teenager. Even though Sanders previously had been misidentified as a member of the Westside Crips, the gang expert found it important that Sanders previously had been convicted as a gang member in possession of a firearm in public. Finally, the gang expert found it noteworthy that, according to Alize, Sanders had told Dorrough, "Fuck Mike-Mike." The expert explained that Mike-Mike referred to Michael Whatley, who had been "essentially an idol" among the Westside Crips. Whatley had been shot and killed around 2015 by an Eastside Crips gang member. According to the expert, the comment attributed to Sanders was extremely disrespectful towards the Westside Crips.

The prosecution's gang expert opined that Gibson was an active member of the Eastside Crips when this shooting occurred. The expert's opinion was based on Gibson's prior contacts with law enforcement, and his association with known Eastside Crip gang members. Gibson had a prior conviction for gang participation.

The jury heard evidence that suggested Dorrough was associated with the Westside Crips. In 2016, law enforcement stopped a vehicle in which Dorrough was an occupant with other individuals. A loaded handgun was discovered inside the vehicle. Dorrough told law enforcement that he had bought it from a person in the park for protection. Dorrough had explained that Hispanic gang members had been shooting African-American gang members. Dorrough said he had friends who were Westside Crips, and his stepfather had family who were in that gang. He also stated he had Eastside Crips in his family.

In 2016, Dorrough told an officer that he had been a close friend to Whatley (Mike-Mike). During that contact, Dorrough denied being a member of the Westside Crips. The officer, however, believed that Dorrough was an associate of that gang because Dorrough made it "pretty apparent" that he "was friends with several Westside Crip gang members."

At trial, the prosecution's gang expert believed that, if Sanders had recruited Gibson to be the driver in this shooting, that fact was significant because one member of the Eastside Crips had directed another member to commit one of the primary activities of the gang. Based on a hypothetical that mirrored the facts from this case, the gang expert opined to the jury that Sanders committed this shooting for the benefit of the Eastside Crips, and this was done in association with or at the direction of that gang.

## XV.    The Jury's Verdicts.

In count 1, the jury convicted Sanders of murder for the death of Dorrough (Pen. Code, § 187, subd. (a)).[34] The jury found true that this murder was willful, deliberate and premeditated, and/or committed by means of lying in wait (§ 189), and they further found true that this murder was committed while Sanders was lying in wait (§ 190.2, subd. (a)(15)). The jury found true that this murder occurred while Sanders was an active participant in a criminal street gang, and this crime was carried out to further the gang's activities (§ 190.2, subd. (a)(22)). The jury found true that Sanders intentionally and personally discharged a firearm that caused Dorrough's death (§ 12022.53, subd. (d)). The jury found true that Sanders committed this murder for the benefit of, at the direction of, or in association with a criminal street gang, and with the specific intent to promote, further or assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)).

In count 2, Sanders was convicted of the attempted murder of Alize (§§ 664/187, subd. (a)). The jury found true that this attempted murder was willful, deliberate and premeditated, and/or committed by means of lying in wait (§ 189). The jury found true that Sanders intentionally and personally discharged a firearm that caused great bodily injury to Alize (§ 12022.53, subd. (d)). The jury found true that he committed this attempted murder for the benefit of, at the direction of, or in association with a criminal

---

[34] All future statutory references are to the Penal Code unless otherwise noted.

street gang, and with the specific intent to promote, further or assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)).

In count 3, the jury convicted Sanders of assault with a semiautomatic firearm involving one of the occupants in the vehicle struck during this shooting (§ 245, subd. (b)). The jury found true that Sanders committed this assault for the benefit of, at the direction of, or in association with a criminal street gang, and with the specific intent to promote, further or assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)). The jury found true that Sanders intentionally and personally used a firearm during this assault (§ 12022.5, subd. (a)).

In count 4, Sanders was convicted of possession of a firearm by a felon (§ 29800, subd. (a)(1)). The jury found true that Sanders committed this crime for the benefit of, at the direction of, or in association with a criminal street gang, and with the specific intent to promote, further or assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)).

In count 5, Sanders was convicted of active participation in a criminal street gang (§ 186.22, subd. (a)). The jury found true that Sanders intentionally and personally used a firearm while actively participating in a criminal street gang (§ 12022.5, subd. (a)).

## XVI. The Prison Sentence Imposed In This Matter.

In count 1, the trial court imposed LWOP. An additional 25 years to life was imposed because of the firearm enhancement (§ 12022.53, subd. (d)). An additional five years was imposed for a prior serious felony conviction (§ 667, subd. (a)(1)).

In count 2, Sanders received life with a minimum parole eligibility of 15 years, which was doubled because of his prior strike conviction. An additional 25 years was imposed because of the firearm enhancement (§ 12022.53, subd. (d)). An additional five years was imposed for a prior serious felony conviction (§ 667, subd. (a)(1)).

In count 3, Sanders was sentenced to the upper term of nine years, which was doubled because of his prior strike conviction. The court imposed an upper term of 10 years for the firearm enhancement (§ 12022.5, subd. (a)). The court imposed a term of five years for the gang enhancement, which was stayed (§ 186.22, subd. (b)(1)). This sentence was enhanced by five years for the prior serious felony conviction (§ 667, subd. (a)(1)). The court ordered the sentences imposed in counts 1, 2 and 3 to run consecutively.

The court stayed the sentences in counts 4 and 5 pursuant to section 654. Sanders's total sentence was LWOP, plus 25 years to life, plus life with a minimum parole eligibility of 30 years, plus 25 years to life, plus 33 years.

## DISCUSSION

### I. Substantial Evidence Does Not Support The Verdicts.

Sanders asserts that the prosecution presented insufficient evidence to convince any rational trier of fact beyond a reasonable doubt that he committed this shooting. He contends that his convictions must be reversed.

### A. A summary of the prosecutor's relevant closing arguments.

To understand the prosecution's theory of guilt, and how the jury was asked to view the evidence, we summarize the prosecutor's relevant arguments regarding Sanders's identity as the shooter before we turn to the parties' respective assertions regarding the sufficiency of the evidence.

The prosecutor contended that Sanders was the direct perpetrator who killed Dorrough, wounded Alize, and who fired the shot that struck the occupied parked vehicle.[35] The prosecutor claimed that Sanders had recruited Gibson, and Gibson had been an aider and abettor in this murder. The prosecutor told the jury that the most

---

[35] The jury was not instructed on the principles of aiding and abetting to determine Sanders's guilt in this matter.

substantial and reliable evidence was the surveillance video. According to the prosecutor, the video proved beyond a reasonable doubt Sanders had fired the shots.

The prosecutor made the following assertions to the jury. In the Fastrip video, Sanders could be seen with a beard. Sanders started "casing" the victims in the restaurant parking lot. His white Toyota Solara could be seen following Alize's vehicle in a recording from a surveillance camera at a gas station along a route connecting the restaurant to the marijuana shop. His Solara could be seen driving past the marijuana shop before this shooting. He could be seen making his way along the fence line at the marijuana shop and approaching Alize's vehicle. The prosecutor claimed that Sanders had the same muscular build, the same clothing, and a "hint of a beard" like the suspect in the video. The prosecutor stated that Sanders's Solara could be seen leaving the scene of the shooting. The vehicle in the video was "low to the ground, [light-colored], if not white. You'll see right around the time that the car turns its light on, there is a grille underneath the front bumper that matches the white Toyota Solara that was seized when [Sanders] was arrested." The prosecutor noted that the shooter got into the passenger side of the vehicle, the same side where Sanders had been when leaving the restaurant. The prosecutor told the jury, "It's the same car."

The prosecutor argued that Sanders's skin tone was "not inconsistent with a Hispanic skin tone." The prosecutor told the jury that Sanders's identity as the shooter had been established beyond a reasonable doubt based on the gang motive, his similar build, clothing and coloring as the shooter, the similarity of the vehicles, and the cellphone data. According to the prosecutor, the jurors could see it was Sanders in the video. The prosecutor contended that Navarro's alibi testimony lacked credibility because the cellphone data showed that Sanders's phone was "across" town after this shooting had occurred. The prosecutor concluded that the jurors would see that the person in the restaurant parking lot was the same person who did this shooting. The prosecutor asked the jury to hold Sanders accountable.

21.

**B.  Standard of review.**

When considering a challenge to the sufficiency of the evidence to support a conviction, we review the record in the light most favorable to the judgment and decide whether it contains substantial evidence from which a reasonable finder of fact could make the necessary finding beyond a reasonable doubt.  The evidence must be reasonable, credible and of solid value.  We presume every inference in support of the judgment that the finder of fact could reasonably have made.  We do not reweigh the evidence or reevaluate witness credibility.  We cannot reverse the judgment merely because the evidence could be reconciled with a contrary finding.  (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)  The standard of review is the same in which a conviction is based primarily on circumstantial evidence.  (*People v. Clark* (2016) 63 Cal.4th 522, 625.)

**C.  Analysis.**

Sanders concedes that the trial evidence suggested his guilt.  He notes, however, that no eyewitness identified him as the shooter, and forensic evidence did not link him as the gunman.  He maintains that he cannot be seen in the surveillance video.  He concludes that a rational trier of fact could not have determined beyond a reasonable doubt either that he was the gunman or that his Solara was the getaway vehicle.

In contrast, respondent emphasizes that Sanders had a gang-related motive to commit these crimes, and the cellphone data showed him in the general vicinity of the marijuana shop when this shooting occurred.  Respondent notes the similarities between Sanders's Solara and the shooter's vehicle.  Respondent asserts that, although the surveillance video is not "superior," the male seen looking into Alize's vehicle moments before this murder "resembled [Sanders]."  Respondent argues that both Sanders and this suspect are very muscular and they wore a similar light-colored shirt and dark pants.  Finally, respondent claims that Navarro's alibi for Sanders lacks credibility.  Respondent

22.

concludes that substantial evidence supports the verdicts, "and this court should reject [Sanders's] attempt to invade the province of the jury."

We reject respondent's various arguments and agree with Sanders that a reasonable jury could not have convicted him as the direct perpetrator of these crimes. As an initial matter, it is impossible to see the face of the male who peered into Alize's vehicle before the shots were fired. However, a watch (or similarly shaped object) is visible on the left wrist of the male who looked into Alize's vehicle. At no time does such an item appear on Sanders's left wrist in any of the surveillance recordings taken of him earlier in the evening. Notably, no such object appears on his wrist while he is outside the restaurant about 10 minutes before the events at the marijuana shop unfold. The object appearing on the suspect's left wrist raises clear reasonable doubt it was Sanders who was recorded spying into Alize's vehicle outside the marijuana shop moments before the shooting took place.

During closing argument, the prosecutor noted that, in the Fastrip video, Sanders could be seen with a beard. The prosecutor asserted that, during the video of the shooting, "a hint of a beard" could be seen on the suspect. Similarly, respondent argues Sanders had the same "gait" as the suspect in the shooting video. In reviewing the shooting video, we fail to discern any beard on the suspect, nor do we see a similar "gait" that might establish Sanders's identity beyond a reasonable doubt as the perpetrator of these crimes.

Further, it is difficult—if not impossible—to determine the racial identity of the male who peered into Alize's vehicle prior to the shooting. Sanders is African-American.[36] The male who peered into Alize's vehicle, however, appears to be white or

---

[36] We note that Alize's sister testified at trial that the person who approached them (i.e., Sanders) outside the restaurant was a "light skinned" African-American male.

Hispanic. This discrepancy raises further reasonable doubt that Sanders perpetrated these crimes.

Garcia told the jury that, on the night of this shooting, he was unable to determine the ethnicity of the male seen peering into the back of Alize's vehicle. He told the jury it was hard to reach a conclusion because the camera appeared to be "in a night vision mode, possibly assisted with an infrared lighting. Anybody that has cameras know[s] that when a camera is in a night vision mode, it could change the complexion of a person." Nevertheless, Garcia testified that, at the time of trial, he believed the subject was "a light-complected African-American male." He also believed the suspect who looked into Alize's vehicle was the same person who fired the shots.

It is impossible to determine from this record how (if at all) the surveillance camera that recorded this shooting may have altered how the shooting suspect appeared. Other than Garcia's brief comment at trial regarding this surveillance camera, the prosecution provided no evidence explaining how night vision mode could, or to what extent does, impact the gray scale of objects and people recorded in black and white. No evidence was introduced to establish how much lighter (if at all) an African-American subject might appear if recorded in night vision mode from this particular camera.

We question the evidentiary value of Garcia's opinion testimony. Although a reasonable and logical inference may be drawn from another fact, an inference may not be based on mere suspicion, imagination, speculation, conjecture or guesswork. (See Evid. Code, § 600, subd. (b); *People v. Davis* (2013) 57 Cal.4th 353, 360.) No foundation was provided for Garcia's lay opinion, and his assessment was based on his own speculation. In short, Garcia's conjecture does not represent substantial evidence. This record fails to explain adequately the discrepancy between Sanders's racial appearance and the racial appearance of the suspect recorded in the surveillance video outside the marijuana shop.

24.

Moreover, after peering into Alize's vehicle, the male subject walks around the corner of the fence near the street. About 78 seconds elapse between the time the male subject disappears around the fence and when the shooter rushes around that fence to open fire.

Because the shooting occurred farther away from the camera, and because the recording is dark and grainy, it is impossible to see the shooter's face. It is also difficult to perceive details about the shooter's clothing. It is unclear if the shooter is wearing the same clothing as the suspect who peered into Alize's vehicle. It appears the shooter might be wearing a hoodie and long-sleeve sweatshirt as he rushes toward the victims and begins to fire. This raises additional reasonable doubt that Sanders was the shooter.

It was the prosecution's theory that both Sanders and Gibson followed the victims to the marijuana shop. Thus, according to the prosecution, a second male suspect was at the scene of this shooting. Given the passage of time when the suspect disappears from view around the fence, and given the difficulty in seeing details about the shooter's appearance, a reasonable inference does not exist that, even if Sanders was the suspect who peered into Alize's vehicle, he was also necessarily the shooter. It is impossible under these circumstances to conclude beyond a reasonable doubt that the first male suspect and the shooter were the same person. This raises additional reasonable doubt that Sanders was the direct perpetrator of these crimes.

It is undisputed that, at some point, Sanders touched Alize's vehicle on the top of the passenger side mirror. In the video outside the restaurant, he is seen standing directly over that side mirror as he leans down in an apparent attempt to speak with Dorrough. His left hand can be seen on that mirror. Thus, it is reasonable to infer that Sanders's palm print was placed on Alize's vehicle at that time before this shooting occurred. In contrast, the shooter is never seen placing his left hand on the mirror. As such, it is not reasonable to infer that Sanders's palm print was placed on the mirror during the shooting.

The cellphone data does not represent substantial evidence supporting the verdicts. This evidence shows that Sanders's phone moved east sometime after 1:33 a.m. His phone was in the general area of the shooting shortly after 2:30 a.m. That general area, however, also encompassed the location of his residence.

Navarro testified that Sanders was home with her by around 2:00 a.m.. Respondent, however, contends that this alibi lacks credibility. According to respondent, Navarro told the detectives that Sanders never came home on the night of this shooting. We disagree with respondent's reading of that transcript.

During Navarro's interview with the detectives, Meyer asked her, "After you guys had your guys' argument over the phone did he come home with uh (Mel)?" Navarro answered, "No he didn't come home with (Mel)." Garcia asked if she knew where Sanders had been and if he had disclosed his location to her. She answered, "Mm-mm no we were mad." At trial, Meyer conceded that he never asked Navarro whether Sanders came home by himself. Instead, Meyer believed Navarro made it clear from the entire conversation that Sanders had not come home that night. During her interview with the detectives, however, Navarro stated that, at about 1:27 a.m., Sanders texted, "I'll see you in 15." Navarro told the detectives that she was mad at Sanders, and, at about 1:30 a.m., she texted him and told him to stop texting her. She told the detectives that they did not text after that because "he was with me on the 4th 'til July 5."

Contrary to respondent's assertions, the record does not reasonably demonstrate that Navarro informed the detectives during her interview that Sanders never came home the night of this shooting. Instead, she said that Sanders did not come home *with Mel*. In any event, even if Navarro's alibi for Sanders lacked credibility, her statements to the detectives neither establish nor even reasonably suggest Sanders was the shooter.

Finally, respondent focuses on Sanders's behavior in the parking lot of the restaurant before this shooting occurred. Respondent contends *both* Sanders and the unidentified male pushed themselves into the passenger area of Alize's vehicle and

26.

reached in to talk to Dorrough. Respondent emphasizes that Sanders used a gang slur to disrespect Dorrough, and Sanders directed Gibson to drive after the victims.

To be clear, Alize's testimony did provide a gang-related motive for why Sanders might want to harm Dorrough. That motive, along with other circumstantial evidence, strongly suggests that Sanders may have been involved in this shooting. However, we disagree with respondent that Sanders's behavior in the parking lot of the restaurant somehow establishes he was the direct perpetrator of the shooting that soon followed.

The cellphone data implied that Sanders could have been at the marijuana shop when these crimes occurred. In addition, the shooter's vehicle was similar in appearance to the Solara which Sanders was using on the night of these crimes. Finally, Sanders does resemble in some ways the male who looked into the back of Alize's vehicle. Nevertheless, the cellphone data was inconclusive, and it failed to establish that Sanders was at the marijuana shop when this shooting occurred. Moreover, based on the poor quality of the various videos, it is impossible to conclude beyond a reasonable doubt that the shooter's vehicle matched Sanders's Solara. In the end, we are left with the low quality video which captured a significant portion of this shooting. As the prosecutor stated during closing argument, that surveillance video is the key evidence in this case.

The prosecution's key evidence, however, fails to establish that Sanders was the shooter. It is impossible to determine beyond a reasonable doubt that Sanders was the male who peered into Alize's vehicle before this shooting occurred. To the contrary, based on the watch (or similarly shaped object) appearing on the left wrist of this suspect, the video evidence strongly suggests that this person was not Sanders. Based on this discrepancy and a variety of other issues already discussed, it is impossible to conclude beyond a reasonable doubt that Sanders was the gunman.

Viewing the evidence in the light most favorable to the judgment, a rational jury could not have found beyond a reasonable doubt that Sanders was the direct perpetrator of the charged crimes. The evidence establishing his identity as the shooter was neither

27.

reasonable, credible, nor of solid value. The circumstances do not reasonably justify the jury's verdicts. Accordingly, substantial evidence does not support Sanders's convictions, and the verdicts must be reversed.[37] Based on principles of double jeopardy, retrial is barred. (See *Lockhart v. Nelson, supra,* 488 U.S. at pp. 39-40; *People v. Pierce, supra,* 24 Cal.3d at pp. 209-210.)

## **DISPOSITION**

The judgment is reversed due to insufficient evidence.

SNAUFFER, J.

WE CONCUR:

SMITH, Acting P.J.

DE SANTOS, J.

---

[37] Because the evidence is insufficient to support the verdicts, we do not address Sanders's remaining claims on appeal.